No. 44,217

In the Matter of the Adoption of KENJI SCOTT WATERS, a Minor. (ARTHUR PHILIP WATERS, *Appellant,* v. ALVIN R. ZWEYGARDT, *Appellee.*)

(408 P. 2d 590)

Opinion filed December 11, 1965.

*Selby S. Soward,* of Goodland, argued the cause, and *C. Bender,* of Goodland, was with him on the briefs for the appellant.

*D. H. Postlethwaite,* of St. Francis, argued the cause, and *Joseph T. Callahan,* of Wray, Colorado, was with him on the briefs for the appellee.

The opinion of the court was delivered by

PARKER, C. J.: This is an appeal from a judgment of adoption made without the consent of the natural father.

There is no substantial dispute as to the facts.

Arthur Philip Waters married Loretta Brinkhoff in Idalia, Colorado, in 1955. Arthur then went to Japan as a teacher in the Armed Forces. Later he was joined by Loretta. Kenji Scott Waters, the subject of the adoption proceedings, was born in Japan on June 12, 1956.

On August 8, 1957, Arthur and Loretta were divorced and by the terms of a child custody agreement Arthur was to have unlimited visitation privileges until Loretta and Kenji left Japan. However, during the short time the mother and child remained in Japan their whereabouts were concealed from Arthur. Loretta, accompanied by Kenji, returned to Idalia, Colorado, the latter part of August 1957. Subsequently, and on June 17, 1960, she married Alvin R. Zweygardt. Since that time Kenji has lived with Loretta and Alvin on a ranch in northwest Kansas, about twenty-four miles

from Idalia, where he has been given the care and affection of a natural son by Alvin.

Arthur has never seen Kenji since the divorce. In fact he has made no attempt to do so. He now lives in Montclair, New Jersey, where he is a high-school biology teacher. Arthur was in Idalia in the summer of 1961. His testimony regarding that visit can be narrated as follows:

"I made no effort to see the boy while I was in Idalia nor did I ask Mr. and Mrs. Brinkhoff [the grandparents] where he was. I did not attempt to call the boy on the telephone nor did I write a letter to the boy in the last five years.. I inquired about his health and growth from my friends in the Idalia community. I didn't go to Mrs. Brinkhoff and ask where the child was because I know what her attitude was toward me during our marriage.

"I did not see an attorney about enforcing my visitation rights but I did stop sending the amount of payment to try to enforce these rights of visitation. Loretta could have known where I was all this time by the return address on the cards and gifts I had sent to Kenji through the years. I made no real effort to find him. I didn't attempt to visit the child because I concluded I would have not been permitted to see him anyway."

The record is not clear as to just what amount of child support was to be paid by Arthur. One Hundred Dollars per month is mentioned. However, it appears that One Hundred Dollars was paid only one or two months. Thereafter Sixty Dollars a month was paid for a time. Subsequently payments were reduced to Fifty Dollars per month. No payments were made after July, 1961. In this connection Arthur testified:

". . . I stopped making payments after the July payment of 1961 because I was convinced that I would never get to see my son without some court action and felt that by stopping the payments, the court action would be commenced, as a result of which I would have an opportunity to visit my son. I expected her to start some action to collect this money since she had done so before. She never commenced any such action but I did receive a notice of the pendency of this action."

The petition of Alvin R. Zweygardt for adoption of Kenji Scott Waters, which was filed in the probate court and was consented to by his mother, Loretta, was contested by Arthur Philip Waters. Arthur's answer to such pleading alleged in part:

"That in an effort to force the issue of this answering party's right of visitation to his son, Kenji Scott Waters, this answering party has, in fact, deliberately ceased making payments for the support of the said Kenji Scott Waters in the desperate hope that Loretta M. Zweygardt would commence some proceeding to require him to make such payments so that by said pro-

ceeding, she could be forced to divulge the location of said child and to grant this answering party reasonable visitation rights to said child."

After a full and complete hearing the probate court found:

". . . that the natural father of said child, Arthur Philip Waters, has failed to assume the duties of a parent for two consecutive years last past and that during said time he has not contributed to the support of said child; . . ."

and entered a decree of adoption in accord with the prayer of the petition.

On appeal from the probate court's decree the district court, after an extended hearing, made findings which, for all purposes here pertinent, may be said to be identical to the heretofore quoted findings of the probate court. Pursuant to such findings the district court entered its decree and judgment ordering that Kenji be adopted by the petitioner and that petitioner be entitled to all the rights of a parent of the child and subject to all the liabilities of that relationship.

Thereupon the natural father, Arthur Philip Waters, perfected the instant appeal wherein he contends:

"The trial court erred in failing to find the appellant had justifiable cause for his failure to contribute to the support of Kenji Scott Waters, and that appellant had therefore not failed or refused to assume the duties of a parent for more than two years preceding the commencement of the action."

The pertinent statute, now K. S. A. 59-2102, reads in part:

"Before any minor child is adopted, consent must be given to such adoption.

"(3) by one of the parents if the other has *failed* or refused to assume the duties of a parent for two consecutive years. . . ." (Emphasis supplied.)

Although this court has not had occasion to consider what constitutes failure to assume the duties of a parent as that term is used in the adoption statute, we have no hesitancy in concluding that the conduct of the appellant, as established by the undisputed evidence in this case, justified the findings of the two courts below.

The appellant's contention that he withheld payment of child support in order to force the mother to give him the right of visitation does not have much force. He testified that he made no particular effort to see the child. He did not know that the right to see the child would be refused. His failure to support the child in an effort to coerce the mother was not in line with his duty as a parent.

The duty of a parent goes further than mere support. We have more in this case than failure to pay child support. A parent who over a period of five years makes no effort to see or talk to a child is in no position to claim he is fulfilling the duties of a parent.

The appellant's defense under the facts as presented might well have appeared to the probate court and to the district court as an after thought designed to excuse the appellant for his shortcomings. In any event whether a parent has failed to assume the duties of a parent for two consecutive years rendering unnecessary consent to adoption is a question of fact. The factual question is one for determination of the trier of facts on competent evidence.

The question of fact having been determined by the probate court and the trial court on substantial competent evidence should not be disturbed by this court on appellate review.

We have not ignored the authorities cited from other jurisdictions. However, they deal with different facts and statutes containing language different from the language of the Kansas statute and are of little if any assistance.

Neither have we ignored appellant's rather ingenious argument to the effect that the trial court erred in finding he had failed to support the child for two consecutive years. The record does not support the appellant's contention. He testified positively that he stopped making payments after the July 1961 payment.

A careful examination of the entire record discloses no error which would justify a reversal of the judgment.

Therefore such judgment must be and is hereby affirmed.

SCHROEDER, J., dissenting: In my opinion Arthur Philip Waters, the father, on the facts in this case has not "failed or refused to assume the duties of a parent for two consecutive years" within the meaning of G. S. 1961 Supp. (now K. S. A.) 59-2102 (3). This provision of the statute is before the court for construction for the first time, and I do not think the legislature intended the rights of a natural parent to be so easily severed.

The law in other jurisdictions seems to be fairly well settled that in order to grant an order or decree of adoption in opposition to the wishes and against the consent of the natural parent, the conditions prescribed by statute which make the consent unnecessary must be clearly proved and the statute construed in support of the right of the natural parent. The law is solicitous toward maintaining the integrity of the natural relation of parent and child, and where the absolute severance of the relation is sought without the consent and against the protest of the parent, the inclination of the courts is in favor of maintaining the natural relation. (2 Am. Jur. 2d, Adoption, § 60, p. 909.)

A case very similar to the facts in the instant case is *Nevelos v. Railston*, 65 N. M. 250, 335 P. 2d 573 (1959). There the New Mexico court stated that willful failure to support under a statutory provision dispensing with consent could not be found where custody was given to a divorced wife, and no support requirements were imposed by the divorce decree, and the children were at all times cared for by the wife and her second husband, where the father kept in touch with the children, brought them Christmas gifts and expressed a willingness to support them.

Again, in *Glendinning v. McComas*, 188 Ga. 345, 3 S. E. 2d 562 (1939), the court held that a father had not abandoned his child even though he had ceased to contribute to the child's support in accordance with the divorce decree, after the remarriage of the mother, and failed to exercise his privilege of visitation as granted by the divorce decree. The court held that his conduct may have been attributed to his personal displeasure at the remarriage and a consequent relationship of the stepfather to his son, as much as to any settled purpose on his part to forsake and abandon the legal rights and claims of parenthood, and for the further reason that it appeared he was an officer in the Army stationed a great distance from the domicile of the child. Therefore, although from the wording of the statute and from the acts of the father, it appeared as though his parental rights could be severed, the court looked at the extrinsic circumstances and construed the statute so narrowly that it could not be effective to sever the parent-child relationship.

Is there any evidence in the record on appeal as a matter of law which the Supreme Court can say supports the finding of the trial court that the natural father in this case failed or refused to assume the duties of a parent for two consecutive years within the meaning of that expression in the statute? Upon analysis of the facts presented by the record and for the reasons hereafter assigned, I think not.

First, the divorce decree severing the marriage relationship between the father and the mother in this case does not appear in the record. It was conceded by the testimony of both the father and the mother that the divorce was a Japanese divorce granted while the parties were living in Japan. The only evidence as to what this decree provided is the testimony of the father and the mother. Their testimony tends to establish that they were divorced in Yokohama, Japan, and it became final on August 8, 1957. The

divorce decree gave custody of the child, Kenji, to the mother. The matter was handled for them by Mr. Oppenhiem, apparently an American attorney stationed in Japan who assisted United States soldiers and their dependents while stationed in Japan. The parties speak of an arrangement or an agreement in conjunction with the divorce in which the father was given unlimited rights of visitation and agreed to pay for the support of the child. The mother testified that the agreement called for payment of $100 per month support. She further concedes "it may possibly be that Mr. Oppenhiem informed Mr. Callahan that the original $100.00 amount had been cancelled and the amount reduced because I had violated the terms of the agreement in failing to allow Mrs. Waters to visit his son. *I deliberately and wilfully prevented Mr. Waters from seeing his son.*" (Emphasis added.)

The father testified that commencing in August, 1957, until September, 1960, he paid $60 a month for the support of Kenji, and that for an additional period of twelve months he paid $50 per month. These sums were sent to the parents of the mother, Mr. and Mrs. Herman Brinkhoff, who resided in Idalia, Colorado, and forwarded by them to the child's mother.

The record is uncontradicted that the mother at all times after the divorce concealed her whereabouts and that of her child from the father. She testified that immediately after the divorce in Japan she left the apartment in which they were living prior to the time she returned to the United States and took her son with her; that by doing so she deprived the father of the opportunity to see his son before she left Japan; that she never informed the father that she and her son arrived safely back in the United States and has never written to him since her return from Japan, either on her own behalf or on behalf of her son, Kenji.

Mrs. Nelson Waters, the paternal grandmother of Kenji, testified that she wrote the mother (apparently addressed to her parents) asking for her address and the child's clothing sizes and things of that nature, but received a reply from the mother saying "if she wanted me to know where she lived and her address, she would let me know."

The mother, to further assist her concealment of the child from the father, made special arrangements to deposit the checks in a bank in Colorado at a place other than where she resided. (After her remarriage she lived in Kansas.) On this point she testified:

"These payments continued to come for more than a year after I was married to Mr. Zweygardt and I never did inform Mr. Waters of the re-marriage or the change in my name and continued to endorse the checks 'Mrs. Loretta M. Waters' for over a year after my re-marriage.

"For approximately a year after I was married to Mr. Zweygardt I re-tained a bank account at Burlington, Colorado, in which I deposited the checks from Mr. Waters on those occasions when I did not cash them to use for Kenji's purposes. I cannot recall any check I received from Mr. Waters for Kenji's support that was not cashed or deposited in Burlington, Colo-rado. . . ."

Both the mother and the father testified that the father sent gifts and letters to Kenji, through the mother's parents, on Christmas, birthdays, Valentine's Day, and on special occasions. The mother, however, testified that she did not think the value of any one of the gifts sent to Kenji was more than $10.

The father testified that he did not make any effort to ask where the child was from the mother's parents because he knew what Mrs. Brinkhoff's attitude was toward him during their marriage.

The father stopped making payments for the support of Kenji after July, 1961, because, according to him, he was convinced he would never get to see his child without some court action, and felt by stopping the payments the mother would commence a court action which would result in an opportunity for him to visit his son.

Whether the trial court believed the father's testimony as to the reason why he stopped payments for the support of Kenji is, in my opinion, immaterial.

The father's failure to pay money through the mother's parents for the support of Kenji for a period of two years cannot be legally excused. But this is the only thread of evidence upon which the court can rely to sustain the finding of the trial court, unless it can be said that the failure of the father to search for the child and re-sort to court action was required. This, however, in my opinion, would be an unwarranted requirement under the circumstances here presented, *where the mother is guilty of deliberately concealing the child from the father*, and where the issue presented is whether the father has failed to assume the duties of a parent for two con-secutive years.

On this point, in my opinion, the failure of the father to send money for the support of his child, through the mother's parents, for two consecutive years is mitigated by the deliberate concealment of the child by the mother, and by the further concealment of her

whereabouts from the father, in violation of his rights as a natural parent. Under these circumstances, I do not think it can be said the father failed or refused to assume the duty of a parent for two consecutive years. If so, the mother is permitted to take advantage of the child's father and the natural parent of Kenji by her own misconduct and contempt for the law.

Perhaps in a situation such as this the child should have a father present in the home where he resides, such as the stepfather in this case, and this may have prompted the probate court and the district court to permit the adoption to stand; but this approach entirely ignores the legal proposition presented and establishes a bad precedent.

It appears to me the decision of the court herein holds that where the parties to a marriage are divorced and the father—the natural parent of the child—fails to pay money for the support of his child for a period of two consecutive years to the mother, he has failed or refused to assume the duties of a parent for two consecutive years within the meaning of K. S. A. 59-2102, even though the mother of such child deliberately conceals the child from the father and also conceals her whereabouts from the father, thereby denying his rights of visitation in violation of the law.

It is respectfully submitted the judgment of the lower court should be reversed on the ground there is no evidence as a matter of law to support the trial court's finding that the father has "failed or refused to assume the duties of a parent for two consecutive years." The reasoning applied in *Nevelos v. Railston,* supra, and *Glendinning v. McComas,* supra, is to be commended and should be applied in the determination of this case.

FONTRON, J., concurs in the foregoing dissenting opinion.