(757 P.2d 1268)

No. 61,073

# In the Matter of the Adoption of B.J.H., JR., A Minor.

Petition for review denied August 26, 1988.

Opinion filed June 17, 1988.

*Bruce C. Harrington*, of Topeka, for the appellant natural father.

*Jack R. Crumpacker*, of Topeka, for the appellee adoptive father.

Before DAVIS, P.J., LARSON and GERNON, JJ.

LARSON J.: The natural father of B.J.H., Jr., appeals from the trial court's decision granting the adoption of his son without his consent by the boy's stepfather. In compliance with Supreme Court Rule 7.043 (1987 Kan. Ct. R. Annot. 34), the parties will be referred to as Father, Stepfather, and Mother.

B.J.H. was born on May 16, 1980. Mother and Father were divorced November 6, 1981. Mother and Stepfather were married on December 1, 1985. B.J.H. and his sister have resided with their mother and stepfather since the marriage.

On November 25, 1986, Stepfather filed a petition in Shawnee County District Court to adopt B.J.H. and his sister. Mother consented to the adoptions. B.J.H.'s sister was adopted by Stepfather without contest.

Father contested the petition to adopt B.J.H. Hearings on the petition were held February 12 and 19, 1987. In a memorandum decision and later by a decree of adoption filed on June 26, 1987, the district court granted the adoption of B.J.H. by Stepfather.

The court found that Father had "failed or refused to assume the duties of the parent for two consecutive years" because his visitations, contacts, communications, or contributions were

"incidental" under K.S.A. 1987 Supp. 59-2102(b). Father appeals.

The case was well tried and testimony from the following witnesses was either uncontroverted, or if controverted, found by the trial court to be as follows:

Court Trustee

Support payments by Father for the applicable two-year period were $580.00. Court-ordered support payments were $50.00 per month. $477.00, representing money withheld from Father's income tax refund, was paid to SRS during the two-year period, but was not credited on the court trustee's records until after the two-year period. Mother's address would not be divulged to members of the public or Father unless an appropriate court order was obtained.

Stepfather

Stepfather knew of no contact by Father with the possible exception of one package delivered to B.J.H. in December of 1985. This package contained boots, a toy gun, and a credit card number in the name of Father's stepfather. Since his marriage to Mother, Stepfather has provided financial support for B.J.H., who refers to him as "Daddy." His phone number where B.J.H. lived has been unlisted since December 1985. He has never taken the position that Mother was not to communicate with Father.

Mother

The only contacts between B.J.H. and Father during the two-year period in question were a telephone call on the child's birthday on May 16, 1985, and a four-hour visit in April 1985. Mother's attitude at first was for Father to be able to visit their son, but she later had a bad experience which gave her concern about the welfare of the child. On one visit where Father took B.J.H. to his grandmother's home, he was under orders not to give B.J.H. sugar or food coloring. When B.J.H. returned, Mother discovered the grandmother had given him jelly beans. Mother was very concerned about B.J.H. being with Father without strict supervision because of the environment in which Father would place the child and because of his threats to kidnap the child.

Mother claims the telephone calls from Father were actually made for the purposes of reconciliation with her and not because

of interests in the child. She testified he wanted to talk to her about "getting back together."

In May of 1985, Mother hired an attorney to file a motion to cancel the outstanding order granting Father's right to take the child to Colorado for two months. The motion was abandoned since Father was not around and did not attempt to exercise the visitation right.

Mother contended the package delivered in 1985 was not from Father but from Father's stepfather. She denied secreting herself and said Father could have gotten in touch with her if he had made proper efforts to do so. She showed exhibits substantiating that her phone number as originally exhibited continued until December 1985. When moving, she filled out forms with the post office and did not attempt to conceal her whereabouts. She testified her present husband provides financial and emotional support for both children and loves them both and shows genuine interest in them. She denied asking mutual friends not to tell Father of her whereabouts.

Father

Father now resides in Farmington, New Mexico. He left employment with Domino's Pizza in Farmington to return to Kansas for the hearing. After the divorce in 1981, he lived in Topeka and exercised visitation rights. He moved from Topeka to Colorado in 1984 and when he returned to Topeka near the end of 1984, he did not know how to contact Mother. In May of 1984, through the services of an attorney, he obtained a court order directing specific visitation which was never exercised because the day he obtained the order, a chance meeting with Mother occurred and the two talked to a counselor. As Mother was upset about his proposal to take B.J.H. to Colorado, he relinquished his demand for visitation. He moved again to Colorado in early 1985, and lived there for eight months. While in Colorado, he made telephone calls on May 16, June 11, July 4, and September 4, 1985, in an attempt to contact his child.

Father returned to Topeka in November and December of 1985. During this time, he made numerous efforts to see Mother and B.J.H. He discovered Mother's phone had been disconnected and there was no new public listing. He went to Mother's former address and called the court trustee's office to try to get information. He also made contact with mutual friends. He then

decided to "give it some time" and left Topeka. Later he sent a package to B.J.H., which was postmarked May 13, 1986; the package was returned to him with "Moved—Return to Sender" written on it.

Father admitted his failure to make additional support payments was not right, but that he had stopped making payments to punish Mother for not letting him see his son. He claimed Mother did not advise him of her whereabouts. He did not know about her remarriage until the adoption papers were served upon him. He claims he did his best under the circumstances and wishes to continue his relationship with his son, whom he loves.

Father's Aunt

Father lived with his aunt in Colorado. She was aware Father had made four or five attempts to make telephone contact with Mother and that he was very upset at the results of his attempts.

Friends of Father

Father came back from Colorado in December of 1984, seeking the whereabouts of his former wife. Friends testified Mother had asked them not to tell Father of her whereabouts. They were uncertain of the year Father left Christmas presents with them for delivery to B.J.H.

Mother

Mother testified on rebuttal the Christmas present referred to by the friends was delivered in December of 1983, which the court found fell outside of the two-year period. She again denied she ever told the friends not to tell Father of her whereabouts.

Father raises eight issues on appeal which need not be separately addressed as the central issue is whether, as a matter of law, the actions of Father were "incidental" under K.S.A. 59-2102(b).

"Ordinarily the question whether or not an individual has failed or refused to assume the duties of a parent for the required period of time is a factual one to be determined by the trier of facts upon competent evidence after a full and complete hearing. [Citations omitted.] When findings of fact are attacked for insufficiency of evidence or as being contrary to the evidence, the duty of the appellate court extends only to a search of the record to determine whether substantial competent evidence exists to support the findings. An appellate court will not weigh the evidence or pass upon the credibility of the witnesses. Under these circumstances the reviewing court must review the evidence in the light most favorable to the party prevailing below. *Craig v. Hamilton*, 221 Kan. 311, 313, 559 P.2d 796 (1977) and cases cited therein." *Aslin v. Seamon*, 225 Kan. 77, 78, 587 P.2d 875 (1978).

The best interests of the child, which *is* the paramount consideration in custody matters, is *not* controlling in determining the statutory issue of whether a natural parent has failed to assume parental duties. *In re Adoption of F.A.R.*, 242 Kan. 231, 235, 747 P.2d 145 (1987). Nor is the fitness of the father as a parent a controlling factor under K.S.A. 1987 Supp. 59-2102(a)(3) as it would be in a proceeding to sever parental rights pursuant to K.S.A. 38-1581 *et seq. In re Adoption of Wilson*, 227 Kan. 803, 806, 610 P.2d 598 (1980).

In order to grant a decree of adoption in opposition to the wishes and against the consent of the natural parent, the conditions presented by statute which make consent unnecessary must be clearly proved and the statute construed in support of the right of the natural parent. The law is solicitous toward maintaining integrity of the natural relation of parent and child, and where the absolute severance of the relation is sought without the consent and against the protest of the parent, the inclination of the court is in favor of maintaining the natural relation. *In re Waters*, 195 Kan. 614, 617, 408 P.2d 590 (1965) (Schroeder, J., dissenting).

Strict construction is necessary to protect the rights of the nonconsenting parent, because a decree of adoption terminates the parental right of the nonconsenting natural parent. K.S.A. 59-2103. Emphasis on protection of natural parents' rights is also bolstered by the United States Supreme Court's decisions which have scrutinized due process rights of natural fathers of illegitimate children. See *Quilloin v. Walcott*, 434 U.S. 246, 54 L. Ed 2d 511, 98 S. Ct. 549, *reh. denied* 435 U.S. 918 (1978).

The Kansas Supreme Court has also held that a parent's reason, if any, for inaction may be properly considered by the court in answer to an adoption petition. *In re Sharp*, 197 Kan. 502, 508, 419 P.2d 812 (1966). In considering whether a nonconsenting parent has failed to assume parental duties for two consecutive years, all surrounding circumstances must be considered. *In re Adoption of F.A.R.*, 242 Kan. at 236.

While the critical statutory period is limited to two years immediately preceding the filing of the petition for adoption (*In re Sharp*, 197 Kan. 502, Syl. ¶ 3), the Supreme Court in *In re Adoption of F.A.R.*, held it was not error to admit evidence of

events occurring prior to that period to the extent relevant to explain or prove conduct or lack thereof during the two-year period. 242 Kan. at 238.

The trial court, in its opinion, distinguished between visitation, contacts, communications, or contributions and "attempts" at accomplishing the same, and held that, although Father initiated a number of good faith attempts to exercise visitation, they were never followed through in a manner of real meaning or benefit to the child.

The trial court then stated the following:

"It is of the essence in applying such a statute, *the Court consider the effect upon the child* in ruling on such crucial matters as the termination of parental rights and the creation of new ones." (Emphasis added.)

The trial court further stated:

"*When viewed from the standpoint of the child,* we see a youngster who went for an entire two (2) year period with one nine (9) minute telephone conversation with his father, with one four (4) hour visitation, with absolutely no written messages of any kind and the Court believes without any gifts." (Emphasis added.)

The wording of the opinion places undue consideration on the "effect upon the child" and improperly weighs and tests the evidence "from the standpoint of the child." As we interpret K.S.A. 1987 Supp. 59-2102, there is no basis for our courts to adopt a "best interests of the child" test and it remains our obligation to consider whether the actions of the father are "incidental" by giving the adoption statutes a strict construction in favor of maintaining the rights of a natural parent. *In re Adoption of F.A.R.,* 242 Kan. at 235.

*In re Adoption of Crider,* 236 Kan. 712, 696 P.2d 356 (1985), was cited by the trial court. In *Crider,* it was held that one attempt to visit a child within the two-year period prior to the filing of the petition for adoption was not substantial evidence of assumption of the duties of the parent and the adoption was allowed. We believe the support furnished and the contacts attempted and completed in this case greatly exceed those of *Crider.*

Recent adoption cases, being fact driven as they must necessarily be, have all considered the central issue of whether contact or action by the natural mother or father is "incidental." *In re Adoption of McMullen,* 236 Kan. 348, 351, 691 P.2d 17 (1984),

held the term "incidental" as used in the statute means "casual; of minor importance; insignificant; of little consequence." The appellant in *McMullen* urged "incidental" to mean something occurring by chance or without any intention, which the court held was too narrow and not in furtherance of the legislative intent. The trial court in *McMullen* found that, during the critical two-year period, the mother sent the children a total of $25, two small gifts, and a few greeting cards, which was "incidental" contact allowing the adoption without her consent.

In *In re Adoption of Steckman*, 228 Kan. 669, 620 P.2d 319 (1980), the father of two children, although able to pay, paid none of the $150 per month child support due over the two-year period. The father remembered one child's birthday each year, once by a present and once by a phone call and sent each child Christmas presents both years. Those contacts were held to be enough to maintain the father's rights as a matter of law, and the trial court's finding that the father had abandoned parental duties was reversed.

The Supreme Court in *Steckman* reviewed at length previous cases dealing with 59-2102 and the evidence required to show that a parent has so abandoned the child as to lose the right to object to the child's adoption. The court found a strict construction of the statute in favor of parental rights was in order and concluded, "In reassessing our holdings in earlier Kansas adoption cases, we interpret K.S.A. 59-2102(3) [Weeks] to refer to those parents who, by their actions, clearly show little or no interest in the welfare of their children." 228 Kan. at 674.

In *In re Adoption of Harrington*, 228 Kan. 636, 620 P.2d 315 (1980), the objecting father had fully paid his child support—albeit the bulk of it was paid a month before the adoption petition was filed. The father had not, however, visited his child during the critical two-year period and had sent only one birthday and one Christmas card. As in *Steckman*, the trial court found the father's actions inadequate to amount to assumption of parental duties but the Supreme Court again reversed, placing its emphasis not only on the payment of child support, but on the conduct of the mother in discouraging visitation, in attempting to cut the father out of the child's life, and in requesting the father's consent to adoption.

The Court of Appeals, in *In re Adoption of Mullett*, 9 Kan.

App. 2d 396, 680 P.2d 307, *rev. denied* 235 Kan. 1041 (1984), had before it a situation where the natural father paid at least $1400 of the $2400 he owed in child support for the two years preceding the filing of the petition for adoption. The father conceded he did not visit his son during the two-year period, nor did he send remembrances other than one card, but the mother admitted she denied the natural father any opportunity to visit the child and stated she wished to cut the father out of his child's life. The Court of Appeals held the non-visitation was explained by the hostility demonstrated by the mother and her new husband. There was substantial evidence to support the trial court's finding that the father had not failed to assume the duties of a parent during those two years, and his consent to an adoption was required. In our decision in *Mullett*, we relied on *Steckman* and *Harrington* as controlling.

The most recent decision in this troubled and difficult area is *In re Adoption of F.A.R.*, 242 Kan. 231. There, the adoption was denied although the natural father was incarcerated in the Kansas Industrial Reformatory serving a prison term of forty-five years to life, since he had made valid attempts to seek specific visitation rights which were thwarted by the mother's reluctance to force the children to visit their father in prison. The mother had returned a small support payment sent by the father, which supported the trial court's finding that the mother interfered with the father's right to keep in contact with his children. The Supreme Court affirmed the district court decision denying the adoption, holding that in making a determination in an adoption proceeding of whether a nonconsenting parent had failed to assume his or her parental duties for two consecutive years all the surrounding circumstances must be considered. The fact that a nonconsenting party was incarcerated and unable to fulfill the customary parental duties required the court to determine whether such parent had pursued opportunities and options which may be available to carry out such duties to the best of his or her ability.

There are compelling reasons which require a reversal of this case. The first is the wording of the trial court's opinion, which indicates the "best interests" of the child was given undue consideration. There is no question but that the trial court's decision is socially desirable, but unless the legislature estab-

lishes different tests in adoption cases we must continue the presently mandated strict construction in favor of maintaining the rights of a natural parent.

An additional reason we must reverse becomes clear when we examine the common thread running through *F.A.R., Crider, Mullett, Harrington, Steckman, McMullen,* and earlier adoption cases. So long as a natural father or mother makes support payments and a real and continuing effort to assume parental duties, a child may not be adopted without the consent and against the protest of one of the natural parents, unless the facts warranting an exception can be "clearly proven." *In re Adoption of Harrington,* 228 Kan. at 638; *In re Sharp,* 197 Kan. at 505.

During the two-year period in this case, support payments were made by Father and additional funds were extracted from his tax refund. Mother had talked Father out of exercising his earlier visitation order. Contact with the child was attempted on at least four occasions, one gift was sent but returned, and there was a four-hour visit in April 1985. Father may have lacked sophistication in locating Mother and B.J.H., but his actions are more than "incidental."

Under our strict interpretation of K.S.A. 1987 Supp. 59-2102(a)(3), we hold upon the whole record presented, as a matter of law, that Father has not "failed or refused to assume the duties of a parent for two consecutive years" prior to the filing of the adoption petition by Stepfather.

Reversed.